Matter of Reclaim the Records v New York State Dept. of Health (2025 NY Slip Op 03102)

Matter of Reclaim the Records v New York State Dept. of Health

2025 NY Slip Op 03102

Decided on May 22, 2025

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on May 22, 2025

No. 49

[*1]In the Matter of Reclaim the Records, Appellant,

v

New York State Department of Health, Respondent.

Michael D. Moritz, for appellant.

Kevin C. Hu, for respondent.

Debra Braverman, et al., The Justice Committee, amici curiae.

RIVERA, J.

The issue on appeal is whether certain information about decedents that is retained and indexed by the New York State Department of Health (DOH) is subject to disclosure under the Freedom of Information Law (FOIL). DOH already publishes an online database that contains a decedent's first and last name, middle initial, date of death, age at death, gender, state file number, and residence code for deaths from 1957 to 1972. Petitioner requests disclosure of these same categories of information and any additional indexed categories of information, beyond those DOH has chosen to publish, for deaths from all available years through 2017.

Based on the record before us, we conclude DOH has shown that disclosure of a decedent's medical history, cause of death, location of interment, and whether they were buried, cremated, or made an anatomical gift, would constitute an unwarranted invasion of personal privacy, and this information is therefore exempt from disclosure under FOIL. We further conclude that DOH has adequately responded to petitioner's request for records for deaths before 1957. However, as to deaths from 1973 to 2017, DOH has not shown that any exemption applies to the same categories of information that it publishes online for deaths from 1957 to 1972, and it must therefore provide those records to petitioner. With respect to any other categories of information contained in DOH's indices of death records, the record is insufficiently developed to adequately review possible grounds for exemption or redaction. Accordingly, we remit the matter to Supreme Court to determine whether DOH must disclose additional portions of its death indices containing other fields of information not addressed herein.

I

Statutory Scheme for Death Records

Public Health Law § 4100 (1) (a) requires that outside of New York City, DOH "have charge of the registration of births and deaths" in the State. DOH's Commissioner must "prepare and maintain a complete typewritten, printed, photographic or magnetically stored index of all births and deaths registered; . . . to be arranged, in the case of deaths, by the names of decedents" (id. § 4100 [2] [g]). DOH publishes an online database that contains limited categories of information for people who died between 1957 and 1972, specifically, a decedent's first name, last name, middle initial, date of death, age at death, gender, residence code, and a state file number (see Genealogical Research Death Index: Beginning 1957, NY DOH https://health.data.ny.gov/Health/Genealogical-Research-Death-Index-Beginning-1957/vafa-pf2s/data_preview [accessed Apr. 17, 2025]). The online database is not a complete "death index" that [*2]satisfies the requirements of Public Health Law § 4100 (2) (g), because it does not include the names of decedents from records on file for fewer than 50 years, or pre-1957. DOH has also created multiple unpublished death indices containing other information from the death records in its custody, including medical history, cause of death, location of interment, and whether a decedent was buried, cremated, or made an anatomical gift.

In addition to its powers and duties under section 4100 (1), under Public Health Law § 4174 (1) (a), DOH may issue a certified copy or transcript of a person's individual death record to an applicant upon request, for seven enumerated purposes:

"(1) when a documented medical need has been demonstrated, (2) when a documented need to establish a legal right or claim has been demonstrated, (3) when needed for medical or scientific research approved by the commissioner; (4) when needed for statistical or epidemiological purposes approved by the commissioner, (5) upon specific request by municipal, state or federal agencies for statistical or official purposes, (6) upon specific request of the [person] charged with controlling disposition of a decedent's remains . . . or (7) pursuant to the order of a court of competent jurisdiction on a showing of necessity."

Section 4174 (1) (a) also exempts these certified documents from disclosure under FOIL (id.).

DOH has promulgated a regulation implementing rules for disclosure of death records that permits release of information for genealogical research purposes by uncertified copy or abstract, "upon written application and payment of the applicable statutory fees" (see 10 NYCRR 35.5 [a]). The regulation imposes a "waiting period" such that "no information shall be released from a record of death unless the record has been on file for at least 50 years" (10 NYCRR 35.5 [c] [3], [d]). This waiting period is automatically waived for "a descendant . . . of the person whose record is being requested" (10 NYCRR 35.5 [d]).[FN1] "All uncertified copies, abstracts or information" released under this regulation "must be clearly marked 'for genealogical purposes only' " (10 NYCRR 35.5 [e]).

II

Petitioner's FOIL Request

Petitioner Reclaim the Records is a not-for-profit organization of genealogists, historians, researchers, and open government advocates. In 2021, petitioner submitted a FOIL request to DOH for all information retained in its death index files, in textual or database format, for all available years through December 31, 2017. At the time, DOH's online database contained the limited categories of information for decedents from 1957 to 1970. Petitioner specified that it was requesting all categories of information in DOH's internal death index files and "not merely the fields shown publicly online."

DOH's Records Access Officer responded to petitioner's FOIL request with a link to the online database and a supplement containing the same limited categories of information for deaths from 1971, which DOH eventually added to the online database. However, the Records Access Officer denied all information from 1972 to 2017, on the ground that the records are exempt from disclosure under Public Health Law § 4174 (1) (a) and its implementing regulation, 10 NYCRR 35.5 (c) (3). They did not address petitioner's request for additional fields of information beyond those included in the public database from 1957 to 1970, or the pre-1957 information in DOH's internal death indices.

On petitioner's administrative appeal, the DOH Appeals Officer agreed that all information for deaths from 1972 to 2017 was exempt from disclosure, because Public Health Law § 4174 (1) (a), as implemented by 10 NYCRR 35.5 (c) (3), prohibits disclosure of information from records on file for fewer than 50 years. Alternatively, the Appeals Officer concluded that DOH could withhold the information from these years, as well as the additional categories of information for deaths from 1957 to 1971 not included in the online database, because disclosure would constitute an unwarranted invasion of personal privacy. The Appeals Officer asserted that the privacy exemption applied because the requested records contained "personal information," and release of that information could facilitate identity theft. However, the Appeals Officer remitted the matter for a diligent search of the pre-1957 records. DOH subsequently provided petitioner with an electronic spreadsheet containing information for deaths from 1880 to 1956.

Petitioner commenced this article 78 proceeding, again requesting that DOH produce complete death index files for all available years through 2017. As in its FOIL request, petitioner sought additional categories of indexed information for deaths from 1957 to 1972 retained by DOH but not published in the online database, and all the indexed categories of information for deaths from 1972 to 2017.[FN2] Petitioner did not address information from pre-1957, other than to acknowledge in a footnote that DOH previously "enclose[ed] death index files covering the time period 1880 to 1956." DOH sought dismissal of the petition. It relied on the same grounds asserted during the administrative process, along with a new argument that the additional indexed information petitioner sought did not exist, because the online database was the sole "death index" within the scope of petitioner's FOIL request.

In support of its answer, DOH submitted, among other things, an affidavit from the Director of its Bureau of Vital Records (BVR). The affidavit asserts that Public Health Law § 4100 (2) (g) only requires DOH to properly index death records in its custody, and that the term "index" refers to "an organization system" allowing DOH to locate those records. Additionally, any death indices DOH has created pursuant to statute "are created from registered death archive records and are used exclusively for the purpose of fulfilling BVR's administrative obligations," with "no legal obligation to publish them or otherwise make then readily available to the public." The Director acknowledged that BVR voluntarily created and published the online database for deaths from 1957 to 1970—at the time the affidavit was written, DOH had not yet added the 1971 or 1972 data—with information it compiled from its archived death records. She claimed that BVR does not maintain other information in the same manner as the information in the public database. Instead, DOH maintains an internal database that contains all information from death records from 1957 to present, from which it may run reports. Accordingly, the Director asserted that to further comply with petitioner's request, DOH would have to create "an entirely new Death Index." Separately, the Director contended that disclosure of the requested records from 1972 to 2017 would violate Public Health Law § 4174 (1) (a), as implemented by 10 NYCRR 35.5 (c) (3), and would also constitute an unwarranted invasion of personal privacy by creating a risk of identity theft and fraud.

In reply, petitioner submitted various records, including an affidavit from a professional genealogist and member of petitioner's board. The genealogist explained that neighboring states have released more contemporaneous death indices without a concomitant increase in reports of fraud or identity theft. For example, New Jersey has released death index files through 2017, Massachusetts through 2013, and Connecticut through 2012. On a national scale, the genealogist compared the currentness of a state's available death index against complaints of identity theft and found no correlation. Additionally, the genealogist explained that in 2021, he submitted a FOIL request to DOH seeking:

"[A]ny DOH reports and memos addressing instances in which disclosure of vital records resulted in identity theft, fraud or criminal behavior; procedures, rules, guidelines and staff instructions discussing how to identify fraudulent orders for vital records; lists of people identified as having tried to fraudulently order a vital record; and any internal guidance or memos addressing why vital records must be protected from unauthorized usage or disclosure."

DOH replied that it had no responsive records in its possession, which the genealogist contended was proof that it did not have serious concerns about the risk of fraud.

Supreme Court, without conducting an in-camera review of the requested records, granted the petition and ordered DOH to disclose them, with social security numbers redacted. The Appellate Division reversed and dismissed the petition in a 3-2 decision (227 AD3d 1303 [3d Dept 2024]). The majority concluded that the additional fields of information for deaths from 1957 to 1972, and all information from 1973 to 2017, were exempt from disclosure by Public Health Law § 4174 (1) (a), which was intended to protect the confidentiality of information contained in certified records, and that disclosure would constitute an unwarranted invasion of personal privacy (id. at 1305-1307).[FN3] The majority also credited the Director's claim [*3]that further action on petitioner's FOIL request would require creation of "an entirely new Death Index" and held that FOIL does not impose such an obligation on DOH (id. at 1307). Two dissenting Justices would have ordered disclosure for all requested years of decedents' names, dates of birth, dates of death, and places of birth and death (id. at 1312-1313). The dissenters concluded that Public Health Law § 4174 (1) (a) is inapplicable, because petitioner did not seek original death certificates or certified copies or transcripts of death records, the only records that the statute exempts from FOIL requests, and that release of this limited information does not constitute an unwarranted invasion of personal privacy (id. at 1309-1311). Moreover, the dissenters argued that the Director's allegations regarding the difficulty of further complying with petitioner's FOIL request were conclusory and insufficient to justify non-disclosure (id. at 1311). Petitioner now appeals as of right (CPLR 5601 [a]).

Our review of the parties' claims is necessarily limited because the record before us is undeveloped. It does not include a complete list of the categories of information contained in DOH's death indices and archives, beyond those in the online database. Further, there is some dispute over the scope of petitioner's request. Petitioner states that it seeks all existing death indices, but it concedes that it is not certain which records DOH retains. The procedural history of this appeal further complicates our task, because Supreme Court granted the petition without examining DOH's death indices in camera, where it could have properly assessed DOH's privacy objections for each existing category of information.

On this limited record, we conclude, as stated above, that: (1) DOH adequately responded to petitioner's request for pre-1957 data, and no further disclosure is necessary for that time period; (2) no exemption under FOIL applies to the categories of information that DOH already publishes online for some years—a decedent's first and last name, middle initial, date of death, age at death, gender, state file number, and residence code—and DOH must therefore disclose that information for all years from 1957 through 2017; and (3) disclosure of a decedent's medical history, cause of death, location of interment, and whether they were buried, cremated, or made an anatomical gift, would constitute an unwarranted invasion of personal privacy, and these categories of information are therefore exempt from disclosure under FOIL. Consistent with this decision, Supreme Court must resolve on remittal any remaining issues regarding additional categories of information.

III.

Freedom of Information Law and Relevant Exemptions

"To promote open government and public accountability, [FOIL] imposes a broad duty on government to make its records available to the public. Moreover, access to government records does not depend on the purpose for which the records are sought" (Matter of Gould v New York City Police Dept., 89 NY2d 267, 274 [1996] [internal citations omitted]). "[FOIL's] premise is that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government" (Matter of Friedman v Rice, 30 NY3d 461, 475 [2017] [internal citations and quotation marks omitted]; see also Matter of Capital Newspapers Div. of Hearst Corp. v Burns, 67 NY2d 562, 565 [1986] ["(FOIL) expresses this State's strong commitment to open government and public accountability and imposes a broad standard of disclosure upon the State and its agencies"]; Matter of M. Farbman & Sons, Inc. v New York City Health and Hospitals Corp., 62 NY2d 75, 80 [1984] ["Full disclosure by public agencies is, under FOIL, a public right and in the public interest, irrespective of the status or need of the person making the request"]).

Under FOIL, "[a]ll government records are . . . presumptively open for public inspection and copying unless they fall within one of the enumerated exemptions" (Matter of Gould, 89 NY2d at 274-275).[FN4] Those [*4]exemptions must be "narrowly construed" (id. at 275 [internal citations and quotation marks omitted]). Withholding records is thus only warranted "where the material requested falls squarely within the ambit of one of these statutory exemptions" (id. [internal citations and quotation marks omitted]). The burden is on the agency to establish that an exemption applies and, to that end, it must articulate "a particularized and specific justification for denying access" (Matter of Harbatkin v New York City Dept. of Records and Info. Servs., 19 NY3d 373, 380 [2012]).

As relevant to this appeal, an agency "may deny access to records or portions thereof that . . . are specifically exempted from disclosure by state or federal statute" (Public Officers Law § 87 [2] [a]). Exemption by agency regulation alone is insufficient to permit denial of disclosure (see Matter of Vertucci v New York State Dept. of Transit, 195 AD3d 1209 [3d Dept 2021] ["(A) regulation is not a statute and, therefore, does not fall within the ambit of this narrowly construed exemption"]). An agency may also deny access to records "if disclos[ure] would constitute an unwarranted invasion of personal privacy under [Public Officers Law § 89 (2)]," which, in turn, sets forth a nonexclusive list of eight protected types of records (see Public Officers Law § 89 [2] [b]). An agency must nevertheless disclose such records, or portions thereof, "when identifying details are deleted" (id. § 2 [c] [i]). When, as here, an alleged invasion of personal privacy involves records that do not fall under the categories enumerated in Public Officers Law § 89 (2) (b), a court must decide if disclosure "is 'unwarranted' by balancing the privacy interests at stake against the public interest in disclosure of the information" (Matter of New York Times Co. v City of New York Fire Dept., 4 NY3d 477, 485 [2005]). This Court has specifically recognized that "[t]he desire to preserve the dignity of human existence when life has passed is the sort of interest to which legal protection is given under the name of privacy," and, accordingly, "surviving relatives have an interest protected by FOIL in keeping private the affairs of the dead" (id. at 485, citing National Archives and Records Admin. v Favish, 541 US 157 [2004]).

We reject the dissent's unfounded and internally contradictory claim that disclosure under FOIL is limited to records that "would shed light on the day-to-day operations of government or the direction and scope of government affairs" (dissenting op at 6). As the dissent concedes, FOIL imposes a much broader mandate (see id. at 4 ["FOIL provides that [a]ll government records are . . . presumptively open for public inspection and copying unless they fall within one of the enumerated exemptions of Public Officers Law § 87 (2)"] [internal citations and quotation marks omitted]). Put simply, and as we have repeatedly stated, any government record is disclosable in response to a FOIL request unless an agency makes a particularized and concrete showing that an exemption—narrowly construed—requires non-disclosure or redaction (see Gould, 89 NY2d at 274-275). Thus, a court must narrowly construe the list of unwarranted invasions of personal privacy set forth in Public Officers Law § 89 (2) (b) (see id.).

Nor is there any basis to apply the limits the dissent proposes to the balancing test the Court developed in New York Times for alleged unwarranted invasions of personal privacy that fall outside the list in section [*5]89 (2) (b) (see 4 NY3d at 485). The Court did not limit the "public interest in disclosure of the information" solely to interests that shed light on government operations or the direction of government affairs. Doing so would fail to narrowly construe the FOIL exemption, in contravention of the Court's established precedent (see id.). On the contrary, the Court recognized as a legitimate public interest in disclosure of 911 calls from September 11, 2001, that "the public know as much as possible about the terrible events of September 11" (id. at 486), an interest that sheds light on neither day-to-day government operations nor the direction of government affairs. The dissent's contention that the public interest was limited to "governmental preparedness for a terrorist attack, the functioning of the 911 system, and the actions of the Fire Department on September 11" (dissenting op at 7) is plainly inconsistent with the phrase "know as much as possible," which necessarily encompasses other purposes. The dissent's effort to narrow the scope of the balancing test recognized in New York Times is utterly lacking in textual support.[FN5]

IV.

Application to Petitioner's FOIL Request

A.

Scope of Request

Petitioner challenges DOH's denial of its request for: (1) death indices with all available categories of information from before 1957; (2) the categories of information already published in the online database but from 1973-2017; and (3) certain additional categories of information from all available years through 2017.

As a threshold matter, DOH raised for the first time during litigation its claim that the online database constitutes the sole "death index" requested by petitioner. Therefore, this contention is therefore unpreserved. DOH did not assert this claim in response to petitioner's FOIL request or in its decision on petitioner's administrative appeal. " '[J]udicial review of an administrative determination is limited to the grounds invoked by the agency' and 'the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis' " (Madeiros v New York State Educ. Dept., 30 NY3d 67, 74-75 [2017], quoting Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 758 [1991]). We are limited to reviewing the justifications for denial that DOH provided at the administrative [*6]level; specifically, whether disclosure is prohibited by Public Health Law § 4174 (1) (a), or whether disclosure of additional records would constitute an unwarranted invasion of personal privacy. In any event, DOH's unpreserved claim is belied by the fact that it expressly disclosed the pre-1957 information to petitioner "[i]n accordance with" the Appeals Officer's instruction to disclose "responsive records" from that time period.

To the extent DOH asserts that there is no other information retained in the form requested by petitioner and that it is not required to organize information specifically for petitioner, we agree that DOH does not have to "create records in order to comply with a FOIL request" (Matter of Data Tree, LLC v Romaine, 9 NY3d 454, 464 [2007], citing Public Officers Law § 89 [3] [a]). However, FOIL provides that "[w]hen an agency has the ability to retrieve or extract a record or data maintained in a computer storage system with reasonable effort, it shall be required to do so" in response to a request (Public Officers Law § 89 [3] [a]). Indeed, "simple manipulation of the computer necessary to transfer existing records should not, if it does not involve significant time or expense, be treated as creation of a new document" (Data Tree, 9 NY3d at 465). DOH asserts that it maintains decedent information up to present day, as it must by law (see Public Health Law §§ 4100 [1] [a], [2] [a], [2] [g]). The BVR Director attested that BVR generates death indices for its administrative purposes. Further, DOH acknowledges that petitioner's FOIL request sought a complete set of the State's death index files, "covering all data that is already retained by [DOH] in textual or database format, for all available dates through December 31, 2017," and "not merely the files shown publicly online." DOH has not made a concrete claim that generating these death indices, just as it does for its own administrative purposes, poses any hardship or would require inputting additional information into its database. Indeed, petitioner has represented to this Court that it only seeks information currently retained by DOH and does not request that DOH create data. For these reasons, we only consider whether DOH established that either of the two FOIL exemptions it invoked during the administrative process applies to the records petitioner requested.

B.

1.

Pre-1957 Information

Petitioner has conceded before this Court that DOH has already disclosed responsive death index files from before 1957, and DOH represents that it has disclosed its existing death indices for 1880 to 1956. In its article 78 petition, petitioner did not argue that DOH's disclosure from those years was insufficient, merely explaining in a footnote that DOH "enclose[ed] death index files covering the time period 1880 to 1956." Based on the record, DOH has adequately responded to petitioner's FOIL request as to this period.

2.

Database Categories of Information for Deaths from 1973 to 2017

We now turn to petitioner's request for death index files from 1973 to 2017. We agree with petitioner that DOH must disclose for those years the same fields of information that are already part of the online database: decedents' first and last names, middle initials, dates of death, ages at death, genders, state file numbers, and residence codes.

DOH's grounds for denying this information are unpersuasive. First, DOH claims that this information is protected by Public Health Law § 4174 (1) (a), as implemented by regulation, and thus exempt from disclosure under FOIL (see Public Officers Law § 87 [2] [a]). "While an applicable 'state or federal statute' need not 'expressly state it is intended to establish a FOIL exemption, we have required a showing of clear legislative intent to establish and preserve that confidentiality which one resisting a FOIL disclosure claims as protection' " (Kosmider v Whitney, 34 NY3d 48, 54 [2019], quoting Burns, 67 NY2d at 567). Public Health Law § 4174 (1) (a) only limits access to individual certified death records, not a death index, and its implementing regulation prohibits disclosure of such records on file for fewer than 50 years. But petitioner does not seek any certified death records. "Where a law expressly describes a particular act, thing or person to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded" (Town of Aurora v Village of East Aurora, 32 NY3d 366, 372-373 [2018] [internal citations and quotation marks omitted]). The legislature understood the distinction between a certified record and a death index—indeed, it is the legislature that requires DOH to maintain a death index—but it nevertheless chose to limit disclosure only of the former.

Other provisions of Public Health Law § 4174 support that the legislature did not intend to categorically limit access to any information from death records in DOH's possession to the seven enumerated purposes in section 4174 (1) (a). For instance, section 4174 (1) (e) requires that the Commissioner "furnish non-identifiable statistical information in tabular or machine-readable format for research activities if satisfied that the same is required for a proper purpose, and the [C]ommissioner is authorized to fix and to require payment of a fee sufficient to compensate the state for the expense of providing the requested information." In addition, section 4174 (3) states that:

"For any search of the files and records conducted for authorized genealogical or research purposes, the [C]ommissioner . . . shall be entitled to, and the applicant shall pay, a fee of twenty dollars for each hour or fractional part of an hour of time of search, together with a fee of two dollars for each uncertified copy or abstract of such record requested by the applicant or for a certification that a search discloses no record."

Together, these provisions show that the legislature anticipated that the public would have an interest in DOH's records of death information on a broad scale, given that the legislature adopted a fee structure to facilitate such disclosure.

DOH's reliance on its implementing regulation as a basis for withholding records on file for fewer than 50 years is likewise misplaced. FOIL exempts information protected "by state or federal statute" (Public Officers Law § 87 [2] [a]), not an administrative regulation. Without a legislative prohibition, an agency cannot insulate its records from disclosure pursuant to FOIL (see Gould, 89 NY2d at 274-275 ["All government records are . . . presumptively open for public inspection and copying unless they fall within one of the enumerated exceptions"]). Here, the 50-year period in DOH's own regulation has no statutory basis.

Second, in invoking the personal privacy exemption, DOH argues that there is a risk that if the withheld information were disclosed, it may be used to engage in identity theft or fraud. However, DOH has not met its burden of showing that this concern relates to a specific and particularized privacy interest (see Harbatkin, 19 NY3d at 380). It has not produced evidence that anyone has used information of the type at issue here to commit identity theft or fraud in a manner that harms people who are living. Nor has DOH explained why, in response to a genealogist's earlier FOIL request, it was unable to locate any records showing that it has taken any precautions against possible fraud. Moreover, DOH has not sufficiently responded to petitioner's evidence that other states have disclosed more recent death indices without a related increase in complaints of identity fraud (see e.g. Washington State Archives—Digital Archives, https://digitalarchives.wa.gov/Collections/TitleInfo/472 [searchable death index through 2017]). DOH's claims about the risk of identity theft or fraud are, on this record, conclusory and insufficient to overcome FOIL's presumption in favor of disclosure.

3.

Additional Categories of Information for Deaths from 1957 to 2017

For the same reasons discussed above, DOH has not established that disclosure of death indices from 1973 to 2017 covering additional categories of information, beyond those DOH publishes in its online database, would constitute an unwarranted invasion of personal privacy by facilitating identity theft or fraud, or that disclosure would violate Public Health Law § 4174 (1) (a).[FN6] In the alternative, DOH asserts that disclosure of this information constitutes an unwarranted invasion of personal privacy because of its sensitive quality. This Court recognized in New York Times that immediate survivors of the deceased may have an interest in keeping private certain information about their loved ones, especially information of a deeply [*7]personal nature (4 NY3d at 484-485). In New York Times, as referenced supra, the New York City Fire Department withheld 911 calls made during the September 11, 2001, attack on the basis that disclosure would constitute an unwarranted invasion of personal privacy (id. at 483-484). Because these records did not fall within the enumerated categories of Public Officers Law § 89 (2), the Court applied the balancing test, weighing the privacy interests against the public interest in disclosure (see 4 NY3d at 485).

The Court concluded that the privacy interests were compelling, because the calls:

"[U]ndoubtedly contain[ed], in many cases, the words of people confronted, without warning, with the prospect of imminent death. Those words are likely to include expressions of the terror and agony the callers felt and of their deepest feelings about what their lives and their families meant to them. The grieving family of such a caller . . . might reasonably be deeply offended at the idea that these words could be heard on television or read in the New York Times" (id.).

On the other hand, the Court acknowledged "a legitimate public interest in the disclosure of these 911 calls," including the public interest in "know[ing] as much as possible about the terrible events of September 11" and the potential for improvement, due to public scrutiny, of a flawed 911 caller system (4 NY3d at 486). However, the FOIL request was not only for 911 calls that shed light on these issues of public interest, but rather for all 911 calls in their entirety (id. at 486). Moreover, the petitioners did not establish that information disclosed in response to other portions of the FOIL request, or that records disclosed by survivors themselves, would be insufficient to satisfy the public interest (id. at 486-487). Those factors tipped the scales in favor of keeping private the final words of the survivors' family members (id.).

The issues presented by petitioner's request present a different balance of interests. On one side of the scales, the information in DOH's death indices since 1972 is not, as a general matter, the type of personal and intimate information that is akin to the words spoken by a survivors' loved ones at the moment of impending death. The privacy interest is therefore of a different caliber than the survivors' interests in New York Times. A person's name, date of death, age at death, gender, government assigned file number, and residence code do not reveal the decedent's deepest feelings or most private affairs. Nor can we say that all additional categories of data in DOH's death indices from this period per se contain sensitive personal information. Additionally, DOH does not assert that this information should never be disclosed, only that it must withhold it for 50 years before making it public. DOH fails to explain how its arbitrary choice of this period protects an identified interest in privacy.

On the other side of the scales, the public interest is significant. Because petitioner intends to make the information disclosed by DOH publicly available for free, disclosure has the potential to expand ready access to information, reducing the backlog of DOH records requests. Disclosure may also reduce fraud by allowing individuals and businesses to confirm the legitimacy of claims and applications for loans and benefits. These are plainly valuable benefits that would, as a matter of common sense, flow from release of death index records. Additionally, disclosure would facilitate genealogical research, which the legislature considers significant enough to facilitate by statute (see Public Health Law § 4174 [3]). Thus, the dissent's assertion that "the public interest is light as a feather" (dissenting op at 22) is simply rhetorical flourish, meant to obscure the fact that it cannot meaningfully contest these benefits of disclosure. For these reasons, the public interest in disclosure of these death index records outweighs the privacy interest in withholding this information, only to release it at a future date chosen by DOH.[FN7]

The dissent's survey of various provisions of Public Health Law § 4174 only highlights that the legislature did not enact a FOIL exemption for the death index, nor suggest that a privacy exemption applies to individual categories of information included in the death index, as opposed to death records more generally (see dissenting op at 9-18). That absence is all the more conspicuous given that the legislature expressly exempted certified death records from disclosure in Public Health Law § 4174 (1) (a). The dissent's efforts to explain away this dispositive distinction by claiming that it is "highly improbable that the legislature intended DOH's index to be publicly disclosable" is pure conjecture (see id. at 19). Even if, as the dissent asserts, the legislature imposed the requirement that DOH maintain a death index to "improve DOH's efficiency in locating records for authorized purposes" (id. at 19), it does not follow that the legislature intended the death index to remain private, particularly since disclosure would "shed light on the day-to-day operations" of DOH as it maintains a significant store of records as required by law (see id. at 6). The public has an interest in ensuring that DOH maintains a proper death index to

aid in speedy retrieval of death records, and any failure keep the death index in proper order may lead to valuable inquiries into whether there are funding or staffing problems.[FN8] Relatedly, the dissent has not persuasively explained why the privacy interest that may apply to a certified copy of "the record of any death" (see Public Health Law § 4174 [1] [a]) extends to individual categories of information contained in a death index (see id. at 11-13). The legislature may have assumed a privacy interest in the entire set of information contained in a certified death record, including the cause of death and related medical information, but not the subset of information compiled in a death index.[FN9] In sum, the dissent's lengthy [*8]analysis of the Public Health Law fails to identify even a minimal privacy interest that requires wholesale withholding of every category of information in the death index, let alone one that it repeatedly promises is "weighty" (see e.g. dissenting op at 11).[FN10]

However, DOH has identified certain information that warrants protection from FOIL disclosure on personal privacy grounds. Specifically, DOH need not disclose a decedent's medical history, cause of death, location of their interment, and whether they were buried, cremated, or made an anatomical gift. These are categories of information that are broadly recognized as personal, involving highly sensitive matters, and are the subject of a certain amount of protection from public view. A person's medical condition and genetic predisposition, or whether they committed suicide or died under unusual circumstances, are intimate details of the decedent—some kept secret in life and then in death, even from close family. Indeed, FOIL already exempts medical information from a patient in a facility, and the federal Health Insurance Portability and Accountability Act protects the confidentiality of medical records for 50 years after death (see Public Officers Law § 89 [2] [b] [ii]; 45 CFR 164.502 [f]).[FN11] Similarly, the disposition of a decedent's body has [*9]historically been considered a solemn, final act in recognition of human dignity, exercised by close family or the decedent's choice. The handling of the body may implicate religious beliefs and traditions which the decedent or survivors wish to be kept private (cf. Shipley v City of New York, 25 NY3d 645, 662 [2015] [Rivera, J., dissenting] ["Under New York's common-law right of sepulcher, the next of kin has the absolute right to the immediate possession of a decedent's body for preservation and burial. The concept of a family's right to burial, recognized by diverse cultures and religious faiths, is age-old and serves an important role in the complexity of human existence"] [internal citations omitted]). Although disclosure of this information may generally be of assistance to genealogical research, petitioner has not shown that disclosure of these categories of information, in particular, is necessary to satisfy the public interests it has identified. On balance, the private interest sufficiently outweighs the public interest. We therefore conclude, based on our application here of the balancing test developed in New York Times, that these categories of information are not subject to disclosure under FOIL.[FN12]

On the record before us, it is unclear which additional categories of information are contained in the records DOH maintains, and we cannot determine the extent to which disclosure of that information might constitute an unwarranted invasion of personal privacy. We therefore remit this matter to Supreme Court to conduct an in camera review and to consider DOH's assertion that this remaining information is exempt from disclosure in its totality, or whether certain portions are subject to redaction. Of course, DOH may only redact portions of records if it shows with particularity and specificity that a FOIL exemption applies (see Harbatkin, 19 NY3d at 380).

Accordingly, the Appellate Division's order should be modified, without costs, by remitting to Supreme Court for further proceedings in accordance with this opinion, and, as so modified, affirmed.

WILSON, Chief Judge (dissenting):

I agree with the majority on certain basic principles: that privacy rights attach to the records of the dead, whether derivatively through their relatives or through a general societal expectation of privacy, and that the way to determine which, if any, of the death records maintained by the New York State Department of Health (DOH) may be obtained through a Freedom of Information Law (FOIL) request involves the balancing of the public interest in disclosure against the privacy interests. Where we disagree is how to strike that balance.

The majority misconstrues and discounts the detailed statutory scheme the legislature has created for regulating death-related information, resorting instead to a balance that rests on a sort of ad hoc ipse dixit. For example, the majority simultaneously asserts that DOH regulations cannot establish a FOIL exemption (majority op at 19), yet relies not on the Health Insurance Portability and Accountability Act (HIPAA) itself, but its implementing regulations, to inform the scope of the privacy interest in medical records, all while discounting DOH's own regulations in the privacy balancing calculus (majority op at 25-26). The majority's justification for excluding place of interment, cremation or other choice rests on a dissent referring to the [*10]right of relatives to determine the manner in which a deceased person's body will be treated—not to any right to keep private the manner chosen (majority op at 26, citing Shipley v City of New York, 25 NY3d 645, 662 [2015] [Rivera, J., dissenting]). In short, the majority's exclusion of certain types of information relating to the dead is not much more than its own idiosyncratic assessment of what should be kept private—based on a very skimpy factual record.

In applying the same balancing test used by the majority (and set out in our caselaw), I come to a different conclusion for two reasons. First, FOIL is designed to shine a light on the inner workings of government, but the information requested by petitioner Reclaim the Records (RTR) serves no such purpose—it is private information that the government collects. As the government collects more and more private information and technology allows (or even necessitates) that it be stored in databases that can be queried with a press of a button, holding, as the majority does, that FOIL recognizes a public interest in disclosure of such information is an invitation to eradicate the privacy of a wealth of personal information. So on one side of the scale, because the purposes of FOIL are not served by disclosure, I conclude the public interest in disclosure is negligible. Second, on the other side of the scale, we have never considered the application of FOIL to records covered by a comprehensive statutory scheme regulating the disclosure of those records. The Public Health Law contains such a scheme, pertaining to both birth and death records [FN1]. The existence of the Public Health Law's legislative and regulatory scheme weighs heavily in establishing the strong privacy interest in the requested information. The fact that the legislation requires the DOH to maintain an index—for its own use and to facilitate the access procedures set out in the statute—in no way suggests that RTR can use FOIL to replace the statutory scheme with a free online database accessible to all. In contrast to the majority's view, the narrowly tailored circumstances in which DOH is authorized to provide a death record demonstrate the legislature's intent that the information be kept private—restricted to those who derivatively hold the privacy rights of the decedent (or whose own privacy rights may be affected by the disclosure of the records). I would therefore affirm the Appellate Division's rejection of RTR's petition to annul DOH's denial of its FOIL request.[FN2]

[*11]I.

I begin in agreement with the majority. In determining whether a particular disclosure would be an unwarranted invasion of privacy, FOIL requires courts to balance the private and public interests at stake (majority op at 12). To ensure that the workings of government are not "shroud[ed] . . . with the cloak of secrecy" (Public Officers Law § 84), FOIL provides that "[a]ll government records are . . . presumptively open for public inspection and copying unless they fall within one of the enumerated exemptions of Public Officers Law § 87 (2)" (NYP Holdings, Inc. v New York City Police Dept., 2025 NY Slip Op 01009, *1 [Ct App Feb. 20, 2025], quoting Matter of Gould v New York City Police Dept, 89 NY2d 267, 274-275 [1996]). One of those exemptions is the personal privacy exemption in Public Officers Law § 87 (2) (b), which provides that an agency may deny access to records that "if disclosed would constitute an unwarranted invasion of personal privacy under the provisions of [section 89 (2)]." Section 89 (2) provides a non-exhaustive list of eight examples of unwarranted invasions of privacy, none of which applies here. Where none of the categories in Public Officers Law § 89 (2) applies, "we must decide whether any invasion of privacy . . . is 'unwarranted' by balancing the privacy interests at stake against the public interest in disclosure of the information" (Matter of The New York Times Co. v City of New York Fire Dept., 4 NY3d 477, 485 [2005]).

II.

In conducting the balancing FOIL requires, "our primary consideration is to ascertain and give effect to the intention of the legislature" (New York Civil Liberties Union v City of Rochester, 2025 NY Slip Op 01010, *2 [Ct App Feb 20, 2025]). In assessing the weight to be given in favor of disclosure under FOIL, we must turn to the purpose of FOIL, asking whether disclosure would be "helpful to the public in making 'intelligent, informed choices with respect to both the direction and scope of governmental activities'" (Matter of Fedn. of New York State Rifle and Pistol Clubs, Inc. v New York City Police Dept., 73 NY2d 92, 97 [1989], quoting Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979]).

The purpose of FOIL is to "promote open government and public accountability" (NYP Holdings, Inc., 2025 NY Slip Op 01009 at *1, quoting Gould, 89 NY2d at 274-275). To do so, "the statute affords the public the means to attain information concerning the day-to-day operations of State government," enabling "the electorate to have sufficient information in order to make intelligent, informed choice with respect to both the direction and scope of governmental activities" (Fink, 47 NY2d at 571, citing Public Officers Law § 84). That purpose is reflected in the statute itself (see id., citing Public Officers Law § 84). Section 84—the legislative declaration of purpose—provides:

"The people's right to know the process of governmental decision-making and to review the documents and statistics leading to determinations is basic to our society. Access to such information should not be thwarted by shrouding it with the cloak of secrecy or confidentiality. The legislature therefore declares that government is the public's business and that the public, individually and collectively and represented by a free press, should have access to the records of government in accordance with the provisions of this article."

The first place I diverge from the majority is the weight to be given to the public interest in disclosure of records of deaths. The majority offers several salutary purposes that it describes as "significant" (majority op at 22)—none of which would shed light on the day-to-day operations of government or the direction and scope of governmental affairs. Reducing DOH's backlog of records requests, the alleged potential for businesses to reduce fraud by checking RTR's database or the facilitation of genealogical research do not further the purpose FOIL is intended to serve.

For the purposes of the unwarranted privacy exemption, the public interest in disclosure is the public interest FOIL was intended to serve. As we have established, "it is precisely because no governmental purpose is served by public disclosure of certain personal information about private citizens that the privacy exemption of section 87 (2) (b) fits comfortably within FOIL's statutory scheme" (Federation of New York State Rifle and Pistol Clubs, Inc., 73 NY2d at 97). In Federation of New York State Rifle & Pistol Clubs, we held that release of the names and addresses of individuals holding rifle or shotgun permits would be an unwarranted invasion of privacy (id.). There, the petitioner sought the list of names and addresses in order to solicit membership dues (id. at 94). We therefore held that Public Officers Law § 89 (2) (b) (iii), which then provided that an unwarranted invasion of privacy included "sale or release of lists of names and addresses if [*12]such lists would be used for commercial or fund-raising purposes,"[FN3] applied (id. at 96). The fund-raising provision is not at issue here. But our conclusion that the release of purely "personal information about private citizens" serves no interest recognized by FOIL (id. at 97) is relevant in balancing the private and public interests at issue in this case [FN4].

In arguing that any conceivable public interest is relevant in the privacy exemption balancing, the majority misreads our decision in New York Times. According to the majority, in New York Times we "recognized as a legitimate public interest in disclosure of 911 calls from September 11, 2001, that 'the public know as much as possible about the terrible events of September 11', an interest that sheds light on neither day-to-day government operations nor the direction of government affairs" (majority op at 13, quoting New York Times, 4 NY3d at 486). The September 11 attacks required and resulted in significant government action at all levels of government. In particular, the "events" we were referring to in New York Times were governmental preparedness for a terrorist attack, the functioning of the 911 system, and the actions of the Fire Department on September 11. Taken in context, the portion of New York Times the majority quotes reads:

"[T]here is a legitimate public interest in the disclosure of these 911 calls. In general, it is desirable that the public know as much as possible about the terrible events of September 11. And more specifically, as the Times and Dwyer point out, the public has a legitimate interest in knowing how well or poorly the 911 system performed on that day. The National Commission on Terrorist Attacks Upon the United States, which had access to the tapes and transcripts at issue here, identified significant flaws in the system's performance, and more public scrutiny might make these problems better understood" (New York Times, 4 NY3d at 486 [internal citations omitted]).

In fact, in New York Times we held that petitioners were not entitled to disclosure of the 911 calls, in part because they had failed to identify "particular calls that may be relevant to this subject" (id. at 486-487). Every call would have served the extremely broad interest the majority identifies in "know[ing] as much as possible about the terrible events of September 11" (majority op at 13-14). Only some calls would have served the purpose of understanding the government's preparedness and response.

Because the disclosure of the information sought by RTR is not germane to FOIL's purposes, I would afford it little or no weight when conducting the balancing FOIL requires. Here, the difference between little weight or no weight is inconsequential, given the magnitude of the weight on the other side of the scale.

[*13]III.

A.

I turn next to the nature of the information stored by DOH. It is, fundamentally, information about and belonging to individuals, not the government. Just as the Department of Motor Vehicles knows my hair color, height and eye color, DOH stores information about people who died or were born in New York State, excluding New York City. As to death records, the record shows that DOH stores information showing year of death, state file number, name, age, gender, date of death, place of residence, Social Security numbers, dates of birth, employment status, military status, pregnancy status, spousal information, parental names, whether an individual is cremated/buried/makes an anatomical gift, attending physician names, whether the death is a result of accident/homicide/suicide, cause of death, whether the death is pending investigation, and past hospitalizations. That information does not belong to the government or show the workings of government to the citizenry; it is private information.

The majority agrees that at least some of that information is private—certainly the past hospitalizations, cause of death and location of burial site, probably pregnancy status and the names of attending physicians, but perhaps not spousal information or military status or Social Security number, and definitely not name, age at death, gender or date of birth or death (majority op at 25-26). My disagreement with the majority therefore is not about whether some of the materials stored by DOH fit within FOIL's privacy exception. We agree that at least some do. Superficially, our disagreement could be seen as one over which materials fall within the exemption. But it is more fundamental than that. My disagreement with the majority is fundamentally about the process by which we determine which of the types of information DOH stores as death records lacks a strong enough privacy interest to overcome the (in my view minimal) public interest in disclosure.

B.

I begin with the majority's methodology. The majority rejects DOH's argument that the requested records are statutorily exempt under Public Officers Law § 87 (2) (a) based on four propositions: (1) Public Health Law § 4174 (1) (a) "only limits access to certified death records," not the death index; (2) Public Health Law § 4174 (1) (e) "requires that the Commissioner 'furnish non-identifiable statistical information in tabular or machine-readable format for research activities if satisfied that the same is required for a proper purpose'"; (3) Public Health Law § 4174 (3) provides that for searches "conducted for authorized genealogical or research purposes," DOH shall collect $20 per hour of searching plus a $2 fee for an uncertified copy of the requested record; and (4) "FOIL exempts information protected 'by state or federal statute,' not an administrative regulation" (majority op at 17-19; emphases added). In its rejection of the unwarranted invasion of privacy exemption, however, the majority all but ignores the Public Health Law. Its only acknowledgement that the detailed statutory scheme might be relevant to determining the public and private interests at stake is its conclusion that section 4174 (3) evinces the legislature's intent to facilitate genealogical research (majority op at 22).[FN5]

In my view, the Public Health Law is both necessary and sufficient to determine the importance of the privacy interest at stake here, and therefore to establish the applicability of the unwarranted invasion of privacy exemption. Although one might conclude that the existence of the Public Health Law's comprehensive scheme removes DOH death records from FOIL entirely without the need for conducting a balancing of interests, because I conclude that DOH may properly withhold the requested records as constituting an unwarranted invasion of privacy, that argument can be left for another day.

In recognition of the fact that death records contain the personal information of private citizens, the legislature constructed a detailed and tightly circumscribed set of rules to regulate their disclosure (Public Health Law § 4174). Contrary to the majority's reading, the provisions on which it relies, as well as several it does not mention, demonstrate the extraordinarily heavy weight the legislature gave to the privacy interest in records of death. Together, section 4174's restrictions on the release of information and fee provisions demonstrate a very weighty interest in protecting information held by DOH against public disclosure.

Beginning with section 4174 (1) (a), which was substantially amended a decade after FOIL was enacted (L 1988, ch 644; L 1977, ch 933), the Public Health Law limits the disclosure of certified copies or certified transcripts of the record of any death to seven highly specific situations that demonstrate a clear interest in the privacy of the records:

"(1) when a documented medical need has been demonstrated, (2) when a documented need to establish a legal right or claim has been demonstrated, (3) when needed for medical or scientific research approved by the commissioner, (4) when needed for statistical or epidemiological purposes approved by the commissioner, (5) upon specific request by municipal, state or federal agencies for statistical or official purposes, (6) upon specific request of the agent charged with controlling disposition of a decedent's remains, . . . children, siblings or, parents of the deceased or the lawful representative of such persons, or (7) pursuant to the order of a court of competent jurisdiction on a showing of necessity."

Moreover, even if a person requesting a certified copy or transcript has demonstrated entitlement under one of the above situations, section 4174 (1) (a) specifically prohibits the use of FOIL to obtain the information.

Section 4174 (1) (a)'s limits on the disclosure of death certificates show that the legislature has recognized a very strong privacy interest in information about the dead. The majority dismisses section 4174 (1) (a) on the basis that RTR "does not seek any certified death records" (majority op at 18). But the question here is not whether there is a statutory exemption, but what the Public Health Law tells us about the weight of the privacy interest involved. Subsection (1) (a) clearly shows that the legislature believed the privacy interests at stake in the certified copies or transcripts to be extremely weighty.

The legislative history of section 4174 (1) (a) shows that the legislature intended the provision to protect the privacy of the underlying information contained in death records. In its memorandum in support of the law, the Department of Health explained that creating specific categories for the disclosure of death certificates would "guarantee the continued confidentiality of death certificates and is in keeping with other provisions of Article 41, which place strict limitations on the release of birth certificates (PHL § 4174), fetal death certificates (PHL § 4160) and the information collected through the Adoption Information Registry (PHL § 4138-b, 4138-c, 4138-d)" (Department of Health Mem at 2, Bill Jacket, L 1988, ch 644). Similarly, the Chairman of the Assembly Health Committee explained that "[i]n order to guarantee complete reporting of accurate information on the death certificate and to protect the privacy of the deceased and the deceased's family, the legislation will restrict inappropriate access to death certificates" (Mem from Richard N. Gottfried to Evan Davis, id. at 15). The purpose of section 4174 (1) (a) is not to restrict access to certification, it is to protect the content of death records.

The majority acknowledges the obvious: the fact that a record is certified is not what underlies the privacy concerns; it is the contents of the record (majority op at 24 n 9). And even the majority, when it later [*14]excludes certain elements of the records on privacy grounds, focuses on the content, not the fact of certification (see id. at 25-26).

The remaining provisions of section 4174 on which the majority relies reaffirm the strong privacy interest in the contents of the records. Subsection (1) (d) provides that the Commissioner will "issue certification of birth or death unless in his judgment it does not appear to be necessary or required for a proper purpose" (Public Health Law § 4174 [1] [d]). The certification of birth or death contains the name, date, place of death and date of filing, but does not contain more (id. § 4100-a [4]). Even so, the statute vests the Commissioner with the discretion to determine whether the requester's purpose is proper. None of our prior FOIL cases involves a statute empowering an executive branch agency to determine the propriety of a request's purpose; the inclusion of that provision here reinforces the heavy weight of the privacy interest at stake.

The majority's reliance on subsection (1) (e) is similarly misplaced (see majority op at 18). That provision demonstrates the legislature's clear instruction to anonymize information that is produced en masse—exactly what RTR is requesting here—by requiring that the information be released only if it is "non-identifiable,"[FN6] "statistical" and "for research activities," and only if the Commissioner is "satisfied that the [request] is for a proper purpose" (id. § 4174 [1] [e]). These several restrictions demonstrate the extremely heavy weight the legislature ascribed to the privacy interest in death records (and birth records — again, this subsection applies equally to both). That is, other than the information allowable under subsection (1) (a) or the very limited information allowable under subsection (1) (d) (which contains the "proper purpose" requirement), the only other data DOH is authorized to release from its death records must be anonymized and limited to research activities for a proper purpose.

Finally, the majority relies on Public Health Law 4174 (3), which requires persons requesting records "for authorized genealogical or research purposes" to pay $20 per hour of searching (plus a fee for an uncertified copy or abstract) (see majority op at 18). Contrary to the majority's interpretation (see id. at 4), that subdivision does not allow anyone to claim a genealogical purpose and obtain uncertified copies of death (or birth) certificates. It does not purport to expand the persons who may obtain records or what records they may obtain but, instead, imposes a fee for the required searching. So, for example, if someone requested a death record of a great-grandparent for the purpose of establishing dual citizenship or a claim of right to a piece of property, subsection (1) (a) (2) would allow the person to engage DOH to search for and deliver the record at a cost of $20 per hour. Furthermore, its limitation to "authorized genealogical or research purposes" reemphasizes the seriousness of the privacy interests contained in the records.

Other subsections of Public Health Law 4174, unmentioned by the majority, further reinforce the importance of the privacy of death records. Subsection (1) (f) provides that even for persons who are entitled to obtain a certified copy of a death (or birth) certificate under subsection (1) (a), DOH may meet its obligation "by the issuance of a certified transcript of the desired certificate or record instead of a certified copy thereof except where the requester shall show, to the satisfaction of the commissioner or his authorized representative, a demonstrated need for such certified copy" (id. § 4174 [1] [f]). A certified transcript is the "short form" version of the full certificate of birth or death, showing much less information than the full certificate (see id. § 4100-a [2]). This, again, represents a legislative determination of the great weight afforded to the privacy of death records.

Subsection (1) (g) allows a local board of elections to receive a certification of death (which contains minimal information), but not a certified copy or certified transcript of the death certificate, again showing that even for necessary intergovernmental requests, the legislature carefully circumscribed the extent of the disclosure of death records to avoid the risk of inadvertent or improper disclosure of private information (id. § 4174 [1] [g]). Likewise, subdivision (5) (a) permits the United States Social Security Administration to [*15]receive "information from death certificates"—but not the actual death certificates or transcripts thereof—and only to the extent "needed in the administration of old-age and survivors insurance benefits laws" (id. § 4174 [5] [a]). Even as to that subset of information, subsection (5) (b) states that the contract will not include any restriction on the use of the information, "except that such contract may provide that such information is only to be used by the secretary (or any other federal agency) for purposes of ensuring that federal benefits or other payments are not erroneously paid to deceased individuals" (id. § 4174 [5] [b]). The legislature thus limited even the federal government's access to DOH's death records to data required for a specific federal purpose, and made disclosure subject to a contract between DOH and the Social Security Administration. Those restrictions again demonstrate the great weight the legislature placed on maintaining the privacy of death records.

Subsection 6, which also concerns access by the federal government, provides that "the federal agency in charge of vital statistics may obtain, at a fee acceptable to the commissioner, information from birth and death certificates for use solely as statistical data" (id. § 4174 [6]). Here too, the legislature restricted the federal government's access to information, not the death certificates or transcripts thereof, and required the federal government to anonymize any results produced from the information. Subsection 7 likewise authorizes the commissioner to establish rules for providing death and birth records "to federal, state and municipal departments for official purposes," again emphasizing the privacy of those records by limiting the disclosure to governmental entities for official purposes (id. § 4174 [7]).

These numerous statutory provisions conclusively demonstrate that the legislature constructed a very restrictive set of rules regarding access to death records, which powerfully demonstrates the immense privacy concerns implicated therein. Beyond the three subsections of Public Health Law 4174 on which the majority incorrectly relies, its remaining justification is that "FOIL exempts information protected 'by state or federal statute,' not an administrative regulation" (majority op at 18, quoting Public Officers Law § 84 [2] [a]). That observation is far off point for several reasons. First, even if a regulation is not relevant to determining whether a statutory exemption exists, it is relevant in conducting the balancing test we have employed to determine whether the privacy exclusion from FOIL applies to particular records. Second, FOIL's statutory exemption for information protected by state or federal statute does not say that information protected by regulation cannot be exempt under the privacy exemption (Public Officers Law § 87 [2] [a]), nor does the majority cite any decision from our court saying that a regulation cannot be relevant in establishing the applicability of an exemption. We have never considered legislation like section 4174 of the Public Health Law, which contains its own set of rules regarding disclosure of sensitive records and which, with regard to a few determinations, vests discretion in the agency to determine the propriety of the purpose behind a records request. It is hardly clear that our existing caselaw displaces the more specific scheme set out in the Public Health Law's treatment of access to records of death. Finally, the majority apparently concedes that regulations can be relevant in conducting the unwarranted invasion of privacy balancing. Counterintuitively, the majority fails to give any weight to New York's own regulations concerning privacy of death records, but when justifying its decision that RTR cannot obtain medical information in DOH's death records, rests on the fact that "the federal Health Insurance Portability and Accountability Act protects the confidentiality of medical records for 50 years after death" (majority op at 25-26). The HIPAA statute itself merely authorizes the United States Secretary of Health and Human Services to promulgate regulations and, tellingly, the provision cited by the majority concerning the confidentiality of medical records for 50 years after death is found only in the regulations. This brings me back to my first point: the provisions of the Public Health Law are relevant not only in determining whether the records are statutorily excluded, but also in conducting the privacy balancing test. The DOH regulations promulgated under New York's Public Health law, more so than the federal regulations promulgated under HIPAA, inform the weight of the privacy concern applicable in New York.

In sum, then, the methodology I use to determine the weight of the privacy interest in death records is to look at the entirety of the Public Health Law's detailed restrictions on access to death records. I conclude that the legislature has deemed the privacy interests extremely weighty.

In the majority's view, the information in the indices is not private at all, it is governmental, because "the government has an interest in maintaining accurate records regarding a person's death" (majority op at 11 n 4). But under that view, all private information becomes governmental simply because the government has it. A government certainly has an interest in maintaining accurate records regarding living people, but [*16]that interest does not render a person's address or credit card number or social media profile "governmental" information.

C.

Next, I examine the majority's rationale for concluding that some information is subject to FOIL and some is not. A linchpin of the majority's determination is that Public Health Law § 4100 (2) (g) requires DOH to maintain an "index of all births and deaths," which is different from death certificates or transcripts thereof (majority op at 3). From there, the majority concludes that because the legislature imposed rules around death certificates and transcripts, but not the index, the index is subject to FOIL (and, indeed, any database DOH maintains is subject to FOIL, save for the items excluded by the majority) (id. at 18).

Again, I cannot read the statute that way. Section 4100 (2) (g) has nothing to do with the privacy interests that inhere in death records. That subsection is part of a list setting out the internal responsibilities of the Department of Vital Statistics—things like "provide suitably equipped offices," "prepare, print and supply" forms, and "examine the certificates received monthly" to make sure they are complete and satisfactory (Public Health Law § 4100 [2]). Nothing about the requirement that DOH prepare and maintain an index bears on the weight of the privacy interest in the data contained in the index.[FN7]

In fact, the legislative history of section 4100 (2) (g) makes it highly improbable that the legislature intended DOH's index to be publicly disclosable. Public Health Law § 4100 (2) (g) originally required DOH to create a "card index" for death records (former Public Health Law § 387; L 1913, ch 619, § 2). As technology advanced, the card index became a "typewritten or printed index" (L 1922 ch 415, § 1), then a "typewritten, printed, photographic or magnetically stored index" (L 1973, ch 81, § 1). Thus, the statutorily required index—which requires inclusion of only the name of the decedent—was plainly required to improve DOH's efficiency in locating records for authorized purposes, not to render the information in computer databases disclosable to the public.

We then arrive at what I find to be the oddest part of the majority's opinion. While announcing the incompleteness of the record, the majority carves out from disclosure four categories of information: (1) medical history; (2) cause of death; (3) location of interment; and (4) whether the deceased was buried, cremated, or made an anatomical gift (majority op at 25). The majority's creation of those categories is not firmly tied to anything—not the statutory scheme of the Public Health Law, not to some other statute, and not to our caselaw. The support consists of the naked assertion that the four categories of information are "broadly recognized as personal, involving highly sensitive matters, and are the subject of a certain amount of protection from public view" (id.).[FN8]

That assertion is then followed by three inapposite citations. The first is to subsection 89 (2) (b) (ii) of FOIL, which exempts from disclosure "items involving the medical or personal records of a client or patient in a medical facility." But that provision is limited to records held by a (governmental) medical facility—not medical records broadly. Even if it could be interpreted to inform a conclusion that medical records of all [*17]living persons are considered private, the application of "a client of patient in a medical facility" to medical records of people dead for 40 years is hardly straightforward.

Next, the majority relies on 45 CFR 164.502—the HIPAA regulation protecting medical records for 50 years (majority op at 25-26). As mentioned earlier, this is a federal regulation. I do not see how the majority can rely on federal regulations to determine the scope of a privacy interest under FOIL while essentially ignoring New York's own statutes and regulations. Finally, the majority cites to Judge Rivera's dissenting opinion in Shipley v City of New York for the proposition that "the next of kin has the absolute right to the immediate possession of a decedent's body for preservation and burial" (id. at 26, citing Shipley v City of New York, 25 NY3d 645, 662 [2015] [Rivera, J., dissenting])—a proposition that has nothing to do with the privacy interest in keeping a burial location secret.

Because I rely on the statutory provisions of the Public Health Law itself to determine the weight of the privacy interests inherent in death records, and because that weight is great and the countervailing weight negligible or nonexistent, I would not remand to require the DOH to provide evidence establishing the privacy of the "additional categories of information" contained in its death records. Furthermore, because the statute's protections are not bounded in time, I would hold that disclosure of any of the records RTR seeks—including those relating to deaths between 1957 to 1972—would constitute an unwarranted invasion of privacy, and therefore cannot be divulged under FOIL.

IV.

Because the great weight given to the privacy of death records can readily be determined on the face of the Public Health Law, and because the FOIL-related interest in the disclosure of those records is essentially zero, there is no need to remit this case. We know enough to know that the public interest served by disclosure of the requested records is not a public interest recognized by FOIL. On the record before us, the Department of Health has established that none of the data it retains in "death indexes" relates to the operation of New York government. Instead, RTR seeks indexes containing the private information of every person who died in New York between 1957 and 2017. The legislature has clearly established that the privacy interest in that information is extremely weighty. The legislature has created a detailed set of procedures by which some of these records may be accessed by a limited set of persons for reasons the legislature has deemed appropriate. The mass publication of death records via FOIL would not in any way advance the purposes of public accountability or open government.

In the privacy balancing, the public interest is light as a feather. The heavy privacy interest in the personal information of the dead must prevail.

Order modified, without costs, by remitting to Supreme Court, Albany County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed. Opinion by Judge Rivera. Judges Singas, Troutman and Mendez concur. Chief Judge Wilson dissents and votes to affirm in an opinion, in which Judges Garcia and Cannataro concur.

Judge Halligan took no part.

Decided May 22, 2025

Footnotes

Footnote 1: The regulation defines a descendant as "a person in the direct line of descent such as a son, daughter, grandson or granddaughter" (10 NYCRR 35.5 [d]).

Footnote 2: During litigation, DOH added information for deaths from 1972 to the online database.

Footnote 3: The majority explained that DOH's implementing regulation could not "create a stand-alone exemption" for withholding the records, but deemed the regulation relevant because it "comports with the statutory insulation of such records—when certified—from a FOIL request" (227 AD3d at 1307).

Footnote 4: FOIL broadly defines "record" to include "any information kept, held, filed, produced or reproduced by . . . an agency . . . in any physical form whatsoever" (Public Officers Law § 86 [4]). This expansive definition encompasses datasets that an agency maintains digitally. The dissent's claim that some datasets that plainly fall under this definition include information "about and belonging to individuals, not the government" is questionable (dissenting op at 8). FOIL's broad definition of "record" does not distinguish between information that is or is not "governmental." Even under the dissent's framing, the government has an interest in maintaining accurate records regarding a person's death for, among other reasons, the proper administration of their estate and to track any investigations into the circumstances of their death. The dissent thus has the FOIL analysis backwards: records are presumed disclosable, but when an agency meets its burden of showing that an enumerated exemption applies, it may withhold those records. The analysis varies based on the specific requested records. The dissent's suggestion that our analysis of the records at issue here would be the same if the contested records were for, as one example, living persons' "credit card number[s]" is baseless (see dissenting op at 18). The dissent also ignores that for any record, including those it labels as not "governmental," FOIL prohibits agencies from construing disclosure as an unwarranted invasion of personal privacy "when identifying details are deleted" (Public Officers Law § 89 [2] [c] [i]).

Footnote 5: Apart from lacking legal foundation, the dissent's framing of the scope of FOIL would increase unnecessary litigation by empowering agencies to withhold records on the ground that they do not relate to day-to-day operations or the direction of government affairs—a hazy line susceptible to differing interpretations. Moreover, the dissent's reliance on Matter of Federation of New York State Rifle and Pistol Clubs, Inc. v New York City Police Dept. (73 NY2d 92 [1989]) is misguided (see dissenting op at 5). That case was decided before the Court first applied the balancing test recognized in New York Times. Additionally, unlike here, it concerned an enumerated personal privacy exemption, which, at the time, permitted withholding lists of names and addresses if they would be "used for commercial or fund-raising purposes" (73 NY2d at 94 n *). The Court observed that the legislature had engaged in its own balancing of the relevant public and private interests to determine that such records should not be disclosed (id. at 97). The Court's analysis ended there (id.). This decision does not support the dissent's broad claim that the public interest in disclosure must be limited to two purposes related to government transparency. Indeed, the dissent fails to cite a single case where the Court has ever described the balancing test so narrowly—nor could they, because no such case exists.

Footnote 6: DOH concedes that disclosure of additional categories of information from 1957 to 1972 would not violate Public Health Law § 4174 (1) (a) or constitute an unwarranted invasion of personal privacy. Regarding this period, DOH solely relies on its unpreserved—and unreviewable—argument that any records not added to the online database are outside the scope of petitioner's FOIL request (see Section IV [A], supra). Accordingly, DOH must disclose responsive records for this period consistent with this opinion.

Footnote 7: The dissent's argument that there is an insufficient factual record to support the public interests in disclosure (see dissenting op at 2, 20 n 8) shifts the government's burden onto the party seeking disclosure. However, the agency must, in the first instance, meet its burden of production. In the context of the New York Times balancing test, the agency must identify some interest that falls on one side of the scales and that the interest outweighs the public interest in disclosure (see Harbatkin, 19 NY3d at 380). Because DOH has failed to do so here, other than for the limited categories of information discussed infra, disclosure is mandated.

Footnote 8: Despite DOH's decision to publish a significant portion of its death index online, the litigation in this appeal (which commenced in 2022), and the fact that the public has sought disclosure of death index records before, the legislature has not amended Public Health Law § 4100 (2) (g) to exempt disclosure of death index records in response to FOIL requests, as it has for certified death records. If the legislature believed as strongly as the dissent that privacy interests should prevent disclosure of any category of information maintained in the death index, it presumably would have amended the statute by now. The legislature's decision not to amend the statute is not merely "legislative inaction," as the dissent characterizes it, because as the dissent describes it, DOH is acting wholly contrary to the scheme that that the legislature has already enacted (see dissenting op at 10 n 5).

Footnote 9: The legislative history of Public Health Law § 4174 (1) (a) establishes that the purpose of exempting certified death records from disclosure under FOIL was to "minimize the possibility of an unwarranted invasion of person[al] privacy" (Department of Health Mem at 13, Bill Jacket, L 1988, ch 644). As explained supra, disclosure of the limited categories of information that DOH already publishes online is not an unwarranted invasion of personal privacy. As to whether disclosure of certain additional categories of information that DOH has chosen to add to its death index records implicates the privacy interests the legislature sought to protect when it amended Public Health Law § 4174 (1) (a), DOH is free to raise arguments on remittal about why disclosure of additional categories of information constitutes an unwarranted invasion of personal privacy.

Footnote 10: Even DOH does not agree with the dissent's claim that the Public Health Law forbids the online death index's publication. Rather than acknowledge that this undercuts its reading of the statute, the dissent makes the tangential point that "no party has raised the issue of whether DOH is empowered to publish the 'Death Index' in its own discretion" (see dissenting op at 19 n 7). The dissent also misstates DOH's unambiguous concession "that the disclosure of personal information in death records that are older than 50 years does not implicate any privacy concerns" (emphasis added). And while the dissent accuses petitioner of trying to "replace the statutory scheme with a free online database accessible to all" (dissenting op at 3), it disregards the fact that DOH has already created such a database, at least for a subset of death index records. The dissent's agenda for exempting all death records from FOIL's reach is unclear, but regardless, the dissent's proposed statutory interpretation is at odds with DOH's view of its duty to disclose. Of course, DOH's views are not necessarily those of the legislature. But DOH is an agency tasked with implementing statutes enacted by the legislature, and the legislature has not once amended the Public Health Law in response to DOH's longstanding publication of large portions of the death index.

Footnote 11: Contrary to the dissent's contention (see dissenting op at 17-18), DOH regulations should not be afforded more weight than a federal regulation when applying FOIL's personal privacy exemption (cf. Hillsborough County, Fla. v Automated Medical Laboratories, Inc., 471 US 707, 713 [1985] [explaining that federal regulations can preempt state law]). But more importantly, the dissent's deference to state agency regulations would allow state agencies to limit their statutory obligations under FOIL and frustrate FOIL's purpose, by promulgating regulations pronouncing privacy interests that justify withholding records.

Footnote 12: The dissent's disagreements with the outcome of our application of this balancing test does not make it "ad hoc" (see dissenting op at 20 n 8). And the dissent fails to identify how our application of that test differs from how courts have faithfully applied it since New York Times (see e.g. Harbatkin, 19 NY3d at 380-831 [applying the balancing test and reaching a different outcome for different records, based on the applicable public and private interests]; New York Lawyers for Public Interest v New York City Police Dept., 192 AD3d 539, 540 [1st Dept 2021] [balancing a family's "compelling interest" in shielding from public access images of a decedent's body from police body-worn camera after a fatal shooting against "public interest in disclosure of the video, to promote better outcomes in mental health crises" by directing the police to disclose the video with appropriate redactions]).

Footnote 1: The majority notes that DOH "concedes that disclosure of additional categories of information from 1957 to 1972 would not . . . constitute an unwarranted invasion of personal privacy" (majority op at 20 n 6). That concession cannot be separated from its context. DOH interpreted RTR's request to encompass only the publicly available "Death Index" for the years 1957 to 1972. The agency thus argued only that it had already disclosed all responsive records. DOH's reading of petitioner's request is overly restrictive. But an understanding of the agency's petition as to the scope of RTR's request makes clear that the agency did not, in fact, waive the privacy arguments it raised at the administrative level. It simply determined, erroneously, that those arguments were not relevant in light of DOH's narrow interpretation of RTR's request.

Footnote 2: As the majority notes, there is no present dispute between the parties concerning pre-1957 records, so no issue concerning them is before us (see majority op at 17).

Footnote 3: In 2008, the legislature replaced the term "commercial" with the term "solicitation" (L 2008, ch 223, § 4).

Footnote 4: Even were we to accept the majority's position that any conceivable public benefit can be placed on the scale, the legislature has already determined how to account for the public benefit through the Public Health Law's disclosure provisions. As discussed below, the legislature carefully set out the procedures that must be used for genealogical research via access to DOH records, which cuts against the idea that the legislature's purpose would be best served by using FOIL to circumvent the legislative scheme set out by statute.

Footnote 5: The majority also suggests that the legislature's failure to amend the Public Health Law to forbid DOH from releasing its publicly-available "Death Index" shows that the legislature did not believe there to be a strong privacy interest in the information of the dead (majority op at 24 n 8). But we have repeatedly held that legislative inaction tells us very little about legislative intent (Bourquin v Cuomo, 85 NY2d 781, 787-88 [1995] ["Legislative inaction, because of its inherent ambiguity, 'affords the most dubious foundation for drawing positive inferences' " (Clark v Cuomo, 66 NY2d 185, 190-191 [1985])]. What the legislature has done in setting out a detailed and comprehensive scheme to regulate the release of death records reveals far more than what it has not.

Footnote 6: The phrase "non-identifiable" was added in 1981 to "ensure that statistical information released by the Commissioner of Health preserves individual privacy" (Budget Report on Bills at 4, Bill Jacket, L 1981, ch 1043).

Footnote 7: The parties have not asked us to decide whether the information DOH already makes public would be subject to disclosure under FOIL, and no party has raised the issue of whether DOH is empowered to publish the "Death Index" in its own discretion.

Footnote 8: The majority writes that I "shift[] the government's burden onto the party seeking disclosure" by finding that there is no public interest in the information RTR seeks (majority op at 23 n 7). But the majority points to nothing in the record that would support its ad hoc exemptions (see id. at 25). In fact, even as to the categories of information the majority itself exempts from disclosure, DOH has offered no proof beyond identification of the existence of the categories of information.